**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.: 1:19-CR-225 (RBW) |
| v. | : | |
| | : | |
| AHMED KHIDIR EL KHEBKI and | : | |
| HUSSEIN FADL OSMAN, | : | |
| | : | |
| Defendants. | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT HUSSEIN OSMAN'S MOTION
AND MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE**

Plaintiff, United States of America, moves to oppose defendant Hussein Osman's

("Defendant") request to be released on bond pending trial.  Docket Number ("DN") 115.

## I.    INTRODUCTION

In 2014, Defendant joined a conspiracy with his sister, Huwida Fadl ("Fadl"), and several

others to embezzle and launder money embezzled from the Kuwait Embassy Heath Office in

Washington, DC (the "Health Office").  In the space of just nine months, Defendant, Fadl, and

their coconspirators used the personal, private health care information and medical records of

real people in need of serious medical care to embezzle and launder over $1.5 million from the

Health Office, a significant portion of which Defendant laundered through a Maryland shell

company that he created to conceal and disguise the source and character of funds that he and his

coconspirators embezzled from the Health Office.

As Defendant and his coconspirators' embezzlement and money laundering scheme

unraveled, Defendant fled the United States, abandoning his family.  In 2016, federal agents

contacted Defendant overseas.  During his calls with agents, Defendant admitted that he had

participated in a scheme to defraud the Health Office and acknowledge that he needed to return

to the United States to address agents' questions about the scheme, but Defendant refused to

return to the United States, choosing to remain a fugitive for over a decade.  It was only after Defendant was captured in Egypt in June 2026 that he was forced to return to the United States and face federal changes that have been pending against him since 2015.

Now, after over a decade of evading these charges, Defendant has the audacity to come before the Court and claim that he is not a flight risk and that he is a worthy candidate for bond. U.S. Magistrate Judge Moxila A. Upadhyaya and Pretrial Services both found Defendant to be a flight risk and nothing in Defendant's Motion and Memorandum in Support of Pretrial Release ("Motion"), DN 115, changes that finding.  As such, the Court should deny Defendant's Motion and keep him detained pending trial.

## II.     BACKGROUND

### A.     The Health Office Embezzlement Scheme

The United States proffers the following facts to support its motion for Defendant's continued detention.  *See United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (holding that United States may proceed by proffer regarding detention).  Business and other records show that in 2014, Defendant began operating under the fictitious name "DBA Medstar Health & Transportation Services" ("Medstar") from a PO Box in Baltimore, Maryland.  Defendant named his fictitious business after a legitimate medical provider, Medstar Georgetown University Hospital ("Georgetown"), which did business with the Health Office.  Defendant and his coconspirators then used the medical records of real Health Office patients to create fraudulent invoices in the names of Medstar and other shell companies and submitted the invoices to the Health Office for payment with the expectation that the fraudulent invoices would deceive the Health Office into believing that Georgetown and other legitimate health care providers had submitted the invoices.  The invoices that defendant submitted to the Health Office for Medstar

represented that defendant provided patients with physician services from his PO Box in Baltimore and directed the Health Office to direct payment to the same PO Box.

Bank records show that Defendant also opened a bank account in Medstar's name at Bank of America and funded the Medstar account with money that Fadl and two of Defendant's other coconspirators, Ahmed El Khebki("El Khebki") and Wael Sedik ("Sedik"), who were also charged criminally, admitted in their plea agreements was stolen from the Health Office. From approximately January 2014 to September 2014, Defendant, Fadl, Sedik, El Khebki, and their coconspirators submitted approximately $1.5 million in fraudulent invoices to the Health Office. Bank records show that a significant amount of the embezzlement proceeds went to Defendant and the Medstar bank account. Once the embezzlement proceeds were in the Medstar account, bank records show that Defendant transferred the funds to his coconspirators, Fadl, and other members of his family and used the embezzlement proceeds to pay personal expenses or withdrew them in cash.

As the embezzlement scheme began to unravel, in July 2014, Defendant fled the United States, abandoning his family in the United States for a new life and family overseas.

**B.      Defendant Is Charged for His Role in the Health Office Embezzlement Scheme**

In 2015, the United States charged defendant by criminal complaint with conspiracy to embezzle and launder money embezzled from the Health Office, in violation of 18 U.S.C. § 1956(h). *See United States v. Osman*, 15-mj-296-AK.

Months later, in 2016, Fadl pleaded guilty to conspiring with Defendant to embezzle and launder money from the Health Office and implicated Defendant in the scheme. *See United States v. Fadl*, 16-CR-211.

In 2019, a grand jury returned the Indictment against Defendant and El Khbeki. DN 10. At the time, both Defendant and El Khebki were fugitives, however, in 2021, authorities in Egypt

3

arrested El Khebki on the charges in the Indictment and returned El Khebki to the United States. El Khebki later pleaded guilty to his role the Health Office embezzlement and money laundering scheme.

**C.     Defendant Refuses to Return to the United States After Admitting He Stole Money from the Health Office and Was Aware of the Investigation into the Theft of Money from the Health Office**

After the United States charged Defendant by criminal complaint, in 2016, federal agents contacted Defendant by phone approximately three times.  During these calls, Defendant admitted that he knew agents were investigating the theft of funds from the Health Office and that he opened a business with Sedik to steal money from the Health Office.  (Sedik pleaded guilty in a related case to his role in the Health Office embezzlement and money laundering scheme.  *See United States v. Sedik*, 16-CR-210.)  Defendant also told agents that he would return to the United States to answer their questions about the Health Office embezzlement scheme after he obtained a divorce from his wife.  Notwithstanding Defendant's representations, Defendant remained a fugitive for over ten years and did not return to the United States until he was captured in Egypt in June 2026 and forced to return to the United States to face the changes in this case.

## III.     ARGUMENT

There are four factors under the Bail Reform that the Court should consider in determining whether to detain a defendant: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. § 3142(g); *United States v. Vasquez-Benitez*, 919 F.3d 546, 550–51 (D.C. Cir. 2019).  These factors, when considered together, establish by a

4

preponderance of the evidence that Defendant is a risk of flight and weigh in favor of continuing

Defendant's detention.  *See Vasquez-Benitez*, 919 F.3d at 551.

**A.      The Nature and Circumstances of Defendant's Offense**

The Indictment alleges that Defendant participated in a prolonged scheme to use the

private, personal health care information and medical records of real people to deceive the

Health Office into paying Defendant and his coconspirators over $1 million that the Kuwait

government had earmarked for the medical treatment of people with medical needs so serious

that they had to travel to the United States for treatment.  *See* 18 U.S.C. § 3142(g)(1).  In a

victim impact statement that the Kuwait government submitted at El Khebki's sentencing, the

Kuwaiti government represented that Defendant and his coconspirators' embezzlement and

money laundering scheme stole money met to pay for illnesses suffered by Kuwaiti citizens and

interrupted the patients' continuity of care, placing the patients at serious risk.  DN 95-1 at 2.

As a result of his criminal conduct, the grand jury charged Defendant with nine counts of

wire fraud, money laundering, and conspiracy to commit both wire fraud and money laundering.

These charges stem from a sophisticated scheme to steal money from the Health Office that

involved securing the cooperation of insiders, the creation of fake shell companies, the creation

of bank accounts for those entities, the doctoring of invoices, and the movement of money

between coconspirators and different bank accounts.  The "circumstances of the offense reveal

that [D]efendant took elaborate steps to conceal his own role in the fraud schemes, including by

[creating] . . . shell companies[] and fraudulent accounts."  *United States v. Otunyo*, No. CR 18-

251 (BAH), 2020 WL 2065041, at *4 (D.D.C. Apr. 28, 2020) (holding that the defendant should

be detained pending trial).

The Indictment alleges that Defendant chose to operate as Medstar because the Medstar

name mimicked that of Georgetown.  DN 10 ¶ 17(b).  Defendant also created a bank account for

Medstar.  And when the scheme began to unravel, he withdrew money from the Medstar account and fled the United States.  Crimes where a defendant has demonstrated the sophistication to set up companies and engage in financial fraud pose a heightened flight risk.  *United States v. Bikundi*, 47 F. Supp. 3d 131, 134 (D.D.C. 2014) (holding detention to be appropriate where, in part, the circumstances of the charged offense included setting up multiple shell companies and engaging in financial fraud).

Defendant also faces significant penalties in this case.  Even if he is convicted of only a single count, he could be sentenced to up to 10 years in prison.  If convicted on all counts, he could be sentenced to up to 160 years of imprisonment.  The crimes with which Defendant is charged are serious and carry serious penalties.  The prospect of such severe penalties weighs in favor of finding that Defendant is a flight risk.  *See United States v. Brown*, 538 F. Supp. 3d 154, 172 (D.D.C. 2021) ("A conviction on any of these offenses would force [defendant] to spend a significant portion of his life behind bars.  The severity of this potential punishment . . . could give [defendant] a strong incentive to flee.").

**B.    Weight of the Evidence**

The allegations in the Indictment are supported by substantial evidence.[1]  El Khebki has already pleaded guilty to the allegations in the Indictment and admitted that he, Defendant and others embezzled and laundered money from the Health Office.  *See* 18 U.S.C. § 3142(g)(2). Defendant's sister, Fadl, and Sedik, also pleaded guilty in related cases to conspiring with

---

[1] Defendant represents in his Motion that the United States has not provided him with discovery. DN 115 at 6.  On the same day as defendant's initial appearance and arraignment, the United States provided defendant with a protective agreement to prevent the disclosure of the patient medical records that Defendant and his coconspirators used to defraud the Health Office.  On June 16, 2026, Defendant represented that he had the signed the agreement but was unable to transmit the agreement electronically to the United States.  Once the United States receives the executed protective agreement from Defendant, it will produce discovery to Defendant.

Defendant, El Khebki and others to steal and launder money stolen from the Health Office and agreed to cooperate with the United States. In fact, in her plea agreement, Fadl admitted to many of the facts that underpin the allegations in the Indictment and implicated Defendant in the scheme. *See* DN 7, 16-CR-211 (Statement of Facts to Fadl plea agreement).

There is no real question that Defendant submitted fake invoices to the Health Office for specific services he did not and could not possibly have rendered. For instance, Defendant submitted invoices for physician services that he claimed he provided from a PO Box in Baltimore. Needless to say, Defendant had neither the equipment nor training to provide such services, and it was impossible to provide them from a PO Box. And there is no question that Medstar did not provide those services to those patients. There is likewise no real question that the Health Office paid those invoices—checks from the Health Office were deposited into Defendant's Medstar bank account, which Defendant controlled. Defendant also admitted to agents that he and Sedik conspired to steal money from the Health Office. Given the overwhelming evidence in this case, Defendant is even more likely to flee, particularly considering the amount of prison Defendant faces and the near certainty that the district court will do as it did to Fadl, Sedik, and El Khebki and impose a custodial sentence on Defendant.

## C.    Defendant's History and Characteristics and Danger to the Community

Defendant's history and characteristics also support his continued detention. *See* 18 U.S.C. 3142(g)(3)(A). Defendant has established that he is not of good character. Defendant participated in a scheme to embezzle and launder over $1.5 million met for patients with severe medical needs and used the patients' private, personal medical information and medical records to accomplish his theft and enrich himself. Defendant also lied to financial institutions to establish and use the Medstars bank account that he and his coconspirators used to launder the money that they embezzled from the Health Office, and when the embezzlement and money

laundering scheme began to unravel, Defendant fled the United States and abandoned his family rather than stay in the United States and accept the consequences for his criminal conduct.

Once defendant was aware of the investigation into the Health Office embezzlement scheme, Defendant did not return to the United States.  Instead, Defendant let Sedik, Fadl, and El Khebki take the fall for his criminal conduct and began a new life overseas with a new family. *See United States v. Dellacroce*, 613 F. Supp. 312, 315 (E.D.N.Y. 1985), *aff'd sub nom. United States v. Carneglia*, 795 F.2d 1005 (2d Cir. 1986) (where "[d]efendant knew that he had been indicted [and] chose to become a fugitive," pretrial detention is appropriate because defendant poses an obvious risk of flight.)  In his Motion, defendant minimizes the ties to his family overseas in a transparent attempt make himself appear less of a flight risk while claiming that he has strong ties to a family in the United States who he abandoned and has not seen for more than a decade.  DN 115 at 4; *see* 18 U.S.C. § 3142(g)(3)(A); *United States v. Brennerman*, 705 F. App'x 13, 15 (2d Cir. 2017) (upholding pretrial detention based on a finding that defendant's "substantial ties abroad" made him a flight risk).  Defendant's argument defies common sense and the facts in this case.  It is difficult to believe that Defendant's overseas family does not provide him with sufficient incentive to flee the United States to avoid prison time in this case. Defendant has spent the last twelve years with his overseas family and has spent little to no time with his family in the United States.  If Defendant were truly as close to his U.S.-based family members as he claims, he would never have abandoned them for a new life overseas.

Notwithstanding the fact that Defendant has not been in the United States with his family for over twelve years, Defendant argues that some of his U.S. family members are willing to support him should the Court release him on bond.  DN 115 at 4.  Defendant does not identify

these family members or provide any information about the amount and source of their finances or the suitability of their homes for home detention.

Defendant also omits from his bond argument that the Health Office embezzlement and money laundering scheme charged in the Indictment was a family affair. Defendant's sister, Fadl, admitted in her plea agreement that she conspired with defendant to embezzle and launder money embezzled from the Health Office, and financial records from the bank account that Defendant controlled for MedStar show that Defendant's U.S.-based family members received thousands of dollars of embezzlement proceeds from Defendant. The involvement of Defendant's family members in the scheme charged in the Indictment disqualifies them from acting as custodians or sureties for Defendant.

Defendant also cannot support himself if the Court were to release him on bond. *See* 18 U.S.C. § 3142(g)(3)(A). Defendant fled the United States to avoid the charges in this case in 2014 and has not lived or worked in the United States for over twelve years. Defendant reported to the Court that he receives approximately $1,100 a month from Social Security, but this money is hardly enough to cover the cost of Defendant's housing, food, and weekly medical treatments.

Moreover, the evidence in this case demonstrates that when defendant is in need of money, he turns to crime, as he did when he joined in the embezzle and money laundering scheme charged in the Indictment. Defendant was willing to place innocent patients at risk by using their private, personal medical information and medical records to steal from the Health Office over a million dollars intended to cover the patients' medical cost. Defendant then fled the United States to avoid arrest and prosecution in this case and refused to return to the United States after he was aware he was under investigation for his role in the Health Office embezzlement scheme– another crime. Defendant's willingness to victimize others and engage

9

in criminal activity to enrich himself and his family along with the sophisticated methods Defendant used to defraud the Health Office demonstrate that Defendant is a danger to the community and that he should be detained pending the resolution of the criminal charges pending against him. *Cf. United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) (defendant convicted of mail fraud posed an economic or pecuniary danger to the community).

## IV.    CONCLUSION

Based on the above, the United States has met its burden and established by a preponderance of the evidence that Defendant is a risk of flight and that the Court should continue to detain him pending trial.

WHEREFORE, the United States respectfully requests that the Court deny Defendant's Motion and detain him pending trial.

MOLLEY MOESER, Chief
Money Laundering, Narcotics and Forfeiture Section

Date: June 17, 2026      *s/ Jonathan Baum*
Jonathan T. Baum
Senior Trial Attorney, International Unit
Money Laundering, Narcotics and Forfeiture Section
United States Department of Justice
1400 New York Avenue NW
Washington DC 20005
202-616-5950

*Attorneys for Plaintiff United States of America*